Good morning, Your Honors. Alice Fontier, Federal Defenders of San Diego, on behalf of Mr. Javier Hernandez-Gutierrez. Counsel, I read by the government's brief that, where was it, page 3, that your client is due for discharge on Monday, Valentine's Day, right? I believe it's coming up, yes, Your Honor. So we set aside this sentence and say it was void and it has to go back and he has to have a pre-sentence report and then he goes through all of that and he winds up in front of Judge Thompson again. Is he going to do more time? No, Your Honor. The only... You're not worried about that? Your Honor, I believe that this court has the power to just vacate the fine. I believe there's sufficient information on the record to show that Mr. Hernandez is indigent and that the... Well, the reason you want to vacate the fine is because no pre-sentence report was made, right? And until we get a pre-sentence report, what authority do we have to vacate the fine? We have to send it back. I would ask to vacate the fine for two reasons. One, because the court didn't make the necessary findings on the record to show that Mr. to allege that Mr. Hernandez had an ability to pay the fine. And part of that was that he wasn't given the opportunity to have the pre-sentence report prepared so that Mr. Hernandez could meet his burden of showing that he couldn't pay the fine. I don't have a pre-sentence report up here to even consider. I usually do. That's correct, Your Honor. However, there is ample... But you waived it, didn't you? I mean, I... How can you waive it under Rule 32? The position I find a little odd is that it was your client who asked for immediate sentencing in conjunction with the plea agreement, and now you're complaining that you didn't have a pre-sentence report. Why shouldn't we hold that he's bound by the waiver and that you are, in essence, a stop to make this argument on appeal? Your Honor, this Court has said in U.S. v. Turner that the defendant has absolutely no ability to waive the pre-sentence report. Any purported waiver in the plea agreement is essentially invalid. The court must find, the district court must find on the record, pursuant to 3553, that they have sufficient information to forego the pre-sentence report. Where the record shows that the district judge went through the colloquy of establishing a knowing and voluntary entry into the plea agreement in conjunction with the Rule 11 plea and recited evidence with regard to the circumstances surrounding your client's crime, can't we find as a factual matter that the record is adequate to establish that the district court did that even though he didn't speak the magic words of incantation? No, Your Honor. The record is replete with examples of Mr. Hernandez's indigency. Doesn't United States v. Vaughn teach us that we can, in fact, do that, that we can look at the entire record, which would consist not only of the verbal statements during the plea colloquy, but also the carefully drafted plea agreement that your office and the United States Attorney's Office negotiated that the court carefully went through when it accepted the plea and the request for a waiver of the PSR here? Your Honor, I don't believe that that is the case. That Vaughn doesn't apply, that it doesn't say that, that I'm wrong? That's not what the Supreme Court told us when it reversed the Ninth Circuit for adhering strictly to a rule that requires only the oral colloquy and nothing else be considered? No, Your Honor. The court can look at the entirety of the record. However, in deciding, the single issue is not whether or not the PSR was waived. The court should look at the entirety of the record to establish whether or not Mr. Hernandez had an ability to pay the fine. And I believe if this Court does look at the record, the full record, then it will be satisfied that Mr. Hernandez does not have an ability to pay the fine. Well, we know that he had at least $3,000 shortly before his arrest, right? That's correct, Your Honor. That is the only information that the district court based the fine on. What more do we need to know? I mean, the fact that he's going to have to pay the fine in installments during the period of his supervised release, it doesn't seem to me to be a stretch to say, well, if he had $3,000 on one occasion, he can afford to pay over a period of time $5,000. Isn't that essentially what Judge Thompson was saying when he recited those facts? That's precisely what he said. However, Your Honor, the fact is Mr. Hernandez, and which was stated during the plea colloquy by his defense attorney, the fact is Mr. Hernandez basically cashed out his entire life savings and every ounce of his worth and had $3,000 in his possession, 1,500 of which was promptly stolen. So when he arrived in the United States, he had approximately $1,500. The purpose of a fine, Your Honor, is not to impoverish Mr. Hernandez for the rest of his life. But we don't have it. There's nothing in the record to suggest that an imposition of a $5,000 fine would impoverish him, is there? We know that on one occasion he had $3,000 in cash on his person. And I don't understand how you can leap by inference to the conclusion that a $5,000 fine would impoverish him. Your Honor, the record shows that Mr. Hernandez is, one, indigent and was deemed so by the court. He has no discernible job skills. The simple fact is he spent a significant amount of time in custody. He also has four children to support. But isn't he going to pay the fine over a period of time? Isn't that the way that usually works? It would, Your Honor, if he were going to be in the United States. However, he's promptly going to be deported upon his release from custody to Mexico, a country in which- We may never collect the fine, but if he comes back to the United States- There it is. Now he's got a problem, right? Exactly. There will be the additional problem of this fine that he has yet to pay. All right. But that still doesn't get back to- What's the answer to my question, then, with regard to impoverishment? I mean, there's nothing in the record from which we can make that conclusion, is there? There is, Your Honor, which is exactly what I'm telling you now, is that he is indigent. That's a simple fact. There's no- There's no- I'm sorry, Your Honor? If immigration is going to deport him immediately upon his release on Valentine's Day, how is he going to go to the- and conduct a pre-sentence report at all? Your Honor, I don't believe that the pre- I believe that the pre-sentence report should have been conducted at the time that he was sent. They may recommend $5,000. That's the trouble. A court, there's nothing in the pre-sentence report as a basis for any kind of an imposition of a monetary penalty. It's just within the guidelines. And it's within, to a degree, it's within the discretion of the court, if there's some facts to support it. But the record is devoid of fact. Which is precisely the problem. The only facts that the court has before it are Mr. Hernandez's indigency, his low intellectual functioning, his lack of job skills, his impending deportation, the significant time he spent in custody- None of which is in a pre-sentence report. All of which is in your brief. And all of which is in the record stated before the court. And as Judge Thomas correctly pointed out, this Court can look at the entirety of the record. The entirety of the record shows that Mr. Hernandez is indigent. The only fact that is before it regarding any amount of money that he's ever had is that at one point in time, prior to his arrest, he had $3,000. That one fact is simply not enough to overcome his well-established indigency to support a $5,000 fine. Well, he apparently is in the business of calling drugs. Is that right? That seems to be a source of income. No, Your Honor. Mr. Hernandez was charged with entering the country illegally. I understand. But didn't the district court go through – the district judge obviously had a rap sheet before him because didn't the plea colloquy include a discussion of his prior drug trafficking convictions? It did, Your Honor. So he does have a fairly substantial record of engaging in drug dealing, doesn't he? He has prior convictions. That's correct, Your Honor. But those were not at issue before the court. Do we have to find then that Judge Thompson was clearly erroneous when he relied upon that sort of evidence in concluding that a $5,000 fine was not unreasonable on these facts? Yes, Your Honor. I believe he was clearly erroneous. And it's well-established precedent in this – it's well-established precedent in this circuit that when a person is adjudged to be indigent, as was Mr. Hernandez, that the court has to go through the record. You're asking us to infer – the mere fact that someone qualifies for CJA counsel at the services of the federal public defender under the legal definition of indigency doesn't mean that they can't afford to pay any fine at all, does it? Or is that the position you're taking? That is not the position I'm taking, Your Honor. I'm taking the position which was established in United States v. Seminole, Cuangara, and again in Sager recently by this Court, that when a person is indigent, the record has to make clear that the court considered the other factors listed in 3572 prior to establishing a fine. The record in this case is only that Mr. – that the district court looked at the fact that he had money at one time and established that he could now pay a fine. Let me ask you a different question. You negotiated – I don't know if it was you personally, but your office, who was representing your client, negotiated with the United States Attorney's Office over the length of the sentence in this case, right? That's correct, Your Honor. Okay, and that's how he ended up with the 30-month sentence, the 6 and the 24. At the same time, the plea agreement recites, and the court in its colloquy during the plea covered the maximum penalties for the offense, which included, what, a $250,000 fine? Yes, that's correct, Your Honor. So why wasn't there any discussion among counsel representing your client with regard to a fine if you were also negotiating over the length of his imprisonment? Your Honor, I think that's another point to be made. Well, the point is that – The sentence that was negotiated between the parties was a sentence of 30 months in custody, which he received, and one year of supervised release, which he received. And it recites his potential exposure to a $250,000 fine, does it not? Your Honor, I don't believe – the plea agreement states the maximum penalties available, yes. However, the negotiated sentence was specifically for imprisonment and the term of supervised release. If the government had wanted to include a fine or had even thought that a fine was remotely possible in this case, it could have easily put it into the language of the plea agreement. Let me turn the question around. Why didn't you or your office negotiate over that point if it was such an important issue? Your Honor, the common practice is that when a fine is considered by either party, then that language is specifically placed in the plea agreement. The silence as to the fine is an understanding between the parties that no fine is recommended. Oh, counsel, come on. Give me a break. Congress passes a statute and says this crime is punishable by imprisonment and a fine, and that's recited in the plea agreement and covered by the colloquy at the plea, and you're telling me that the fine is simply irrelevant, that the lawyers don't have to worry about that? Your Honor, the language in the plea agreement states that the negotiated sentence was for 30 months in prison and one year of supervised release. It doesn't say anything at all about a fine. Correct, Your Honor, which is because it was not a negotiated element of this offense. Neither party ever contemplated a fine in this case. Do you think a good lawyer would simply put a sentence in the plea agreement that says, and the parties stipulate that there shall be no fine? Your Honor, the simple fact is these fast-track agreements negotiated with the government are essentially boilerplate. They don't include a fine because neither party considers a fine. So it's everybody's fault. It's the fault of the government and the fault of defense counsel for not doing their job. Is that what your argument is? Certainly, Your Honor. If either party had ever contemplated that a fine would be assessed in this case, the language would have been in the plea agreement. However, it wasn't even within the realm of possibilities in considering the sentence in this case. Well, it was certainly within the realm of possibility in the contemplation of Congress when it enacted the statute, wasn't it? It was, Your Honor. However, it wasn't negotiated between the parties, and the fine is outside of the terms of the plea agreement. I think that's what you're saying. You made a deal with the U.S. Attorney's Office, be 30 months and one year's, you know, supervised release. And that's what you expect, that the court would impose that sentence? And that's why you didn't think it was necessary to have a probation report. That's precisely correct, Your Honor. And when you don't have a probation report and you waive that, you save the government a lot of money. Correct again, Your Honor. And where would you – what paragraph would you turn to me in the plea agreement where I'd be able to make that determination? Your Honor, the language in the plea agreement that contemplates the sentence is paragraph – I see the sentence, but that's – the question that Judge Pregerson was asking you was essentially that it – that that is the sum and substance of the deal. That's correct, Your Honor. There's nothing that addresses a fine in there, is there? No, Your Honor, because the contemplated sentence is exactly paragraph 6, line 1. The parties jointly agree that the sentence in this matter should be 30 months' imprisonment followed by one year of supervised release. A fine is part and parcel of a sentence. If it was a negotiated part of the sentence between the parties, it would have been included in paragraph 6. It is outside of the terms of the agreement. It was not contemplated by either party. And it was not expected by Mr. Hernandez, which is why he agreed to immediate sentencing. Why don't we find a waiver from the fact that the district court found that he had knowingly and voluntarily entered into this agreement with the understanding that he was subject to a maximum possible punishment as set forth in the statute?  A waiver of what, Your Honor? A waiver of his challenge to the fine, given the fact that he was notified at the time he entered the plea that the court could impose a $250,000 fine in addition to the maximum punishment under the statute. All right. During the year. Well, I mean, is it the reality that you've got this person over there, doesn't understand English, you make a deal for him, he thinks it's fine because you've told him it's fine, and then the court asks all these questions about constitutional rights and this and that. They don't have the foggiest notion of what that's all about. Unfortunately, that is the reality, Your Honor. It's just a ritual we go through to make us feel better. And that's the reality of it. So all that language, he probably doesn't understand half those words or maybe more than half. I would agree with that, Your Honor. That's why you wanted a probation report after the fine was. And the judge said no. And he's required under the law to order a probation report. And a defendant can't waive preparation of a pre-sentence report. Again, I would agree with you, Your Honor. That's your argument. That is my argument. And the reason we don't want people to waive probation reports is that they follow them into prison, and the prison authorities have got all that information on them. Right? Yeah, they use that. That's correct, Your Honor. Okay. So that's what, you know, one of the things that bothered me was if you send it back for resentencing, you know, you might end up with a $250,000 fine. You know, that's possible. It is entirely possible under the statute, Your Honor. Well, it's possible under that statute for other reasons, too. It's true, Your Honor. I firmly believe, however, that the record shows already that Mr. Hernandez cannot afford even the $5,000 fine. He believed at the time of sentencing, and I believe now, that a pre-sentence report would simply make that, his indigency and his inability to pay this fine, clearer to the court. At this time, I'm not asking for it to be returned. Did he fill out a form to get the services of your office? He did, Your Honor. Actually, Your Honor, I'm sorry, that's incorrect. In our district, when someone is charged with being found in the United States, they are not required to fill out the financial affidavit. The attorney at the time of arraignment simply has to interview the person and then make a proffer. Based on the proffer as to his economic status during arraignment, the magistrate court, the magistrate judge determined him to be indigent and assigned counsel. The magistrate judges are. Let me ask you. They like to go through these in a hurry because they've got so many of them down there. That's correct, Your Honor. Thousands of them. Counsel, am I correct in reading paragraph 8 of the plea agreement that had the district court imposed a higher sentence than 30 months, which it was entitled to do, the defendant would not have been permitted to withdraw the plea because the sentence was within the sole discretion of the district judge? That's correct, Your Honor. There would be an inability to withdraw the plea, but, again, I don't believe appeal would be waived if a sentence greater than 30 months was assessed by the – was imposed by the district court. Well, you're not challenging the conviction anyway, so. No, Your Honor, I'm not. The only question is whether we're going to do something with it here or whether we're going to send it back for re-sentencing. I really don't. Have you discussed with the government the 5,000? As a practical matter, how are they going to collect the money? Couldn't you two lawyers, being sensible, come to some kind of an agreement and get rid of this thing and let the guy go on Valentine's Day? Your Honor, I wish it were that simple. If Mr. Jones will agree right now to waive the fine, I'll sit down happily. Well, you're doing a valiant job, but, I mean, you know, frankly that's a very practical question. I think you're doing a good job and a valiant job. What happened to the $1,500? Your Honor, I believe he took it with him to custody, and I believe he's been making payments. I'm not exactly sure what he's done with his money. I believe it's on his books with him in custody. At the prison? Yes, Your Honor. Okay. And, again, he would be able to perhaps pay that amount of money, but, again, that would leave him with absolutely nothing when he's returned to Mexico. Well, yeah. Well, if he's got it on deposit with a prison, the government can seize it, I suppose. That's correct, Your Honor, and I imagine that is what would happen. I believe the procedure when somebody is about to be released is that the government can seize that money, and then there are obvious civil methods for receiving the payment of the fine. Did he earn any money while he was in prison? He is working, Your Honor, and I went through the employment procedures under the Federal Bureau of Prisons, and as a noncitizen who hasn't obtained a high school education, his maximum pay rate while he's in prison is $0.12 an hour, half of which goes towards the fine. I believe I went through the math in my reply brief. It comes out to during the period of his confinement, which he was available for work, if he had been given the right to a 40-hour-a-day full work week, which we know not to be true, the maximum amount he would have been able to pay towards the fine was around $140, which is simply not even close to the $5,000 that was fully assessed. Okay. So we'll hear from Mr. Jones as to whether $1,640 is close enough. Thank you. All right. Thank you very much, Counsel. Good morning, Your Honors. May it please the Court, my name is Randy Jones, and I represent the appellee of the United States in this case. First of all, I don't even believe that we should get to the merits of this case. We believe that the appellant has waived his right to appeal the decision of Judge Thompson. We believe that in this particular case, if you look at the plea agreement, the plea agreement clearly states that if the defendant will waive his right if he's sentenced within 30 months of custody. And that's exactly what happened. Is it that, or can you help me with my reading of paragraph 8? Because I read that paragraph, which your two offices jointly negotiated, as being a broader waiver. It basically says that Judge Thompson could have given him the maximum sentence. Basically, paragraph 8 talks about this not being a plea that is binding on the court. So in that sense. It's not what we used to call an 11E1C, and I can't remember what they've been renumbered to, but it wasn't, the sentence itself was not binding on the district judge. That's correct. Well, let me ask you something. On the fast track, this is kind of a standard deal, isn't it? Yes, it is, Your Honor. So if it wasn't, if the court doesn't go along with these. If it doesn't go along with. Then it follows up your whole operation, right? Huh? This is a follow-up. We'd have to go back and decide whether or not we would charge him with the 1326. No, no, no. I mean, you're making these deals with hundreds of people, right? That's correct. And if the word gets out, you make a deal with the U.S. Attorney's Office, and the judge adds on to it, you ain't going to be making any deals. Well, that's not absolutely true. Sometimes we have. They've got no other place to go. Well, actually, we do have cases, and counsel can tell me. It's part of the fast track. Right. It's part of the fast track, but not all of the fast track cases are even accepted by the court. Sometimes Judge Thompson will look at a case and say, I'm not going to take this plea, so I'm going to send it back down to the court that it's assigned to. And then you have to renegotiate or recharge the defendant at that time. Oh, he's a senior judge now. Correct. So he's got his doors open to take these pleas? That's correct. And his statistics are built up real good, huh? I'll leave that for Judge Thompson. I believe they all be there. Why would he want to get rid of business? But we believe that, you know, in this case, you know, the defendant had an opportunity to go over the plea agreement with competent counsel. He did that. The judge went through the plea colloquially. The defendant stated that he understood the terms of the agreement. Counsel reiterated that fact and told the court that the defendant understood the terms of the plea agreement. And one can only assume that the counsel representing the defendant at the time of this plea went over the fact that the maximum penalty included a $255,000 fine in this particular case. And I'm sure the defendant asked questions, as they commonly do, you know, is the judge going to sentence me to a $255,000 fine? And counsel would have explained to him that the judge could, you know, impose that sort of fine, but in all likelihood probably won't. So we believe that because the defendant was advised of his rights and knew what the statutory maximum penalty was, he voluntarily and knowingly agreed to this plea agreement, and therefore the agreement caused him to waive his right to appeal. Mr. Jones, I noticed that the plea colloquy was taken through an interpreter. Is there any indication in the record that an interpreter had met with the assistant Federal public defender and the defendant to go over the terms of the written plea agreement before he signed it on? I don't believe that the plea colloquy indicates that. But we don't know. We don't know. But normally, and Federal defenders sometimes will go and actually interview the clients because they speak Spanish, a lot of them speak fluent Spanish. They would do that, or they would have a court interpreter to do that. But the point of the matter is that the plea agreement was gone over with the defendant. Defendant stated he understood. And here's a man who's been in the United States for a long time, and as you've indicated, has been through the court system. He's had at least four convictions involving drug deals. So we believe that he understood exactly what was going on with this case, and his surprise at getting a $5,000 fine is not enough to merit the court remanding this case back to Judge Thompson. Let me ask you this. If we were to set aside the ‑‑ not the judgment of conviction, but the sentence imposed, send it back for a Rule 32 required pre-sentence report, and you finally get an opinion about, oh, six weeks or so after we get through with it, and he's gone to Mexico because he got out on the 14th of ‑‑ Your Honor, if I could correct you on that. Well, I think according to our calculation, his projected release date is April 14th. It's April 14th. All right. So April 14th. But I understand your question with respect to that. I mean, I submit that if you remand it, he'll go back to Mexico, and we won't have the time enough to get a pre-sentence report in this case. It normally takes anywhere from eight to 11 weeks to get a pre-sentence report, and I submit ‑‑ Well, are you going to hold him during that period then? Correct. You're not going to release him? No, we wouldn't release him because the case would be set back. How can you hold him? Yeah. What have you got to hold him on? By what authority do you extend his period of incarceration for the preparation of a pre-sentence report? You've got some problems. I mean, both sides have problems on this thing. Do you think maybe you get together over the weekend and let us know on Monday that you've got something resolved? You know, that's something that could be considered, but I think ‑‑ Is that a yes or a no? That's a neither. Yeah, that's what I thought it was. No, I think that the court is ‑‑ I mean, that the government is valid. Why don't you do this? You know, you've only got three minutes left. Why don't you just go to the phone, call your office, and tell them that the judges seem to indicate that you ought to settle this case for the $1,500 that they've got in their hand, huh? A bird in the hand, huh? And make the deal right now. Well, you know, because we're a little short of money, the government might want to give you money. We're not in a clean negotiation. No, I understand that. I'm speaking hypothetically. No, I understand that, but we submit that the defendant has the ability to pay. Here's an able‑bodied man who's no doubt been working on the one hand and can work in the future. If he goes down to Mexico, he'll be lucky to make a dollar a day, right? Well, I don't know. I mean, not everybody in Mexico is poor like not everybody in the United States is poor. He has the ability and, in fact, has indicated that he's going to go back to Mexico to work. So we believe that if he goes back to Mexico and work comes back into the United States, we can get the money. But if he's got that big fine, then he'll go back and do the work we don't want him to do. That's what he knows, apparently. Well, I submit that perhaps he may have gotten some of his money from ill‑gotten gains, which the statute requires that that isn't a reason that the court can also impose a fine, because you can discourage them of those funds. Have you got the money to check it, whether there's any traces? No, we haven't done that. But what we're saying is that we have an able‑bodied man here, you know, a young man who has the ability to work. And I think Judge Thompson also took that into consideration when he imposed this fine. Here's a man who had at least $3,000 in the cash and a check. Can I ask you a question? Yes, sir. Off the record. I'm afraid of that. How many of these cases that you have on the fast track where you make a deal, you know, with so many months and so much ‑‑ so many ‑‑ a year of, you know ‑‑ Supervised release. Supervised release. You make a deal like that, just like this one, how many of those end up where there's ‑‑ the court comes in and puts a fine on top of it? Not many. Not many. I would concede that not many of those cases end up with a fine. That would be bad for business, wouldn't it? For your office. Well, you know, we're in the business of trying cases on behalf of the United States. Well, you're in the business of running these cases through. That's right. And the last time I looked, the government didn't do a very stellar job in collecting fines. Well, I think our collection unit would argue differently. They tell me they collect millions and millions of dollars each year.  I doubt if they're doing it on the backs of people like this defendant. But I think in a case like this where there's evidence that he does have money, that he does have the capacity to earn money. They give you the money. Not just the $1,500. We want the $5,000. A guy like that owed me $5,000. He said, I'll give you $500 now and forget about it. I'd say, show me the money. Well, we will take that into consideration, no doubt. But, again, I think that the case should be dismissed without even getting to the merits. Why don't you go make a phone call? Go down and calculate the present value of the $5,000. Your honor is a tough one. It's $10 a month over the next 50 years. But he'll be on supervised release to some degree and he'll be working. He'll be making more than $10 a month. Let's get real here. The guy's going to be gone. All you really want this for is the sword of Damocles hanging over this guy's head so that when he comes back across the border and gets caught dealing drugs again, you'll be able to violate him on the supervised release because he didn't pay the $5,000 fine. Well, if he's dealing drugs, we'll violate him on dealing drugs. That's true. But we're hoping that if he comes back and he has the money with him, we can then collect the money. Do you have evidence about Damocles and that agreement? No other questions, your honor. I'm done. Thank you. I tell you, we'll let you use the government's phone. But don't talk too long. Robert, take him out and put him in the room and give him the phone, huh? Yeah. Okay. Yeah. And let us know what happened before you leave. All right. I'll make that phone call. Thank you. Because we've got the Federal Protective Service around the building. And you're not leaving until you make the phone call. All right. Okay. Okay. Thank you very much. All right. All right. Next case is Tuer versus John Ashcroft Gonzalez. And that's submitted. Now we come to capital.
judges: Pregerson, Beezer, Tallman